## AFFIDAVIT OF NICHOLAS GROOM, LPN

STATE OF OKLAHOMA        )
                         ) ss.
COUNTY OF OKLAOHMA       )

I, Nicholas Groom, LPN, being of legal age and being first duly sworn, attest and state as follows:

1. I have personal knowledge of the information provided in this affidavit.

2. I am a Licensed Practical Nurse who is licensed to practice in the State of Oklahoma.

3. I was employed as a Charge Nurse for Turn Key Health Clinics, LLC, at the Creek County Detention Center during the times relevant to the care and treatment of Russell Foutch at issue in this case.

4. During the times relevant to Mr. Foutch's incarceration at the Creek County Detention Center, Turn Key did not (and was not contracted to) have a nurse on staff 24/7.

5. I performed Mr. Foutch's intake patient health assessment on February 23, 2016. [See TK004-TK005].

6. During Mr. Foutch's intake patient health assessment on February 23, 2016, Mr. Foutch reported to me that he had a mental health history of anxiety and depression and that he had a medical history of a right hip fracture in 2014. He further reported his current medications were Remeron and Risperdal, which he reported had been prescribed during his incarceration at the Oklahoma State Reformatory Work Center (prison) in Granite, Oklahoma. [See TK004-TK005].

7. Mr. Foutch's vital signs during the intake patient health assessment on February 23, 2016 were stable (Temperature: 97°, Blood Pressure: 142/90, Pulse: 65, Oxygen Saturation:

1

95%), and his physical exam was unremarkable [See TK004].

8. Immediately after performing Mr. Foutch's intake patient health assessment on February 23, 2016 at approximately 1:06 p.m., I sent a medical records request to the Granite prison to request a copy of Mr. Foutch's medical records so that I could confirm his diagnoses and prescription medications. [See TK007-TK008].

9. The same day, Mr. Foutch's medications list was received from the Granite prison, which confirmed he was on the following prescription medications: Lamictal; Diphenhydramine Hydrochloride (a/k/a Benadryl); Mirtazapine (a/k/a Remeron); Risperidone (a/k/a Risperal); and Celexa. [See TK010].

10. That evening, the Nurse Practitioner was notified of the medication list received from the Granite prison, and the Nurse Practitioner entered telephone orders to continue Mr. Foutch's medications that met with Creek County Detention Center's protocol. [See TK009, TK020].

11. On February 23, 2016, Nurse Practitioner Lela Goatley entered telephone orders to start Mr. Foutch on: Lamictal, Remeron, Risperidone, and Celexa. [See TK011].

12. On May 20, 2016, Nurse Practitioner Goatley entered telephone orders to continue Mr. Foutch's prescriptions for Lamictal, Remeron, Risperdal, and Celexa. [See TK023].

13. On Sunday, September 25, 2016, Mr. Foutch for the first time made a verbal complaint (*i.e.*, he did not submit a Sick Call Request Form) of having a Cold, for which he was assessed by a Turn Key nurse the same day. [See TK022].

14. At the time he was assessed by the nurse on September 25, 2016, Mr. Foutch reported he was having shortness of breath which were recent in onset, and that he was experiencing night sweats. The nurse noted Mr. Foutch had a productive cough with pinkish

phlegm. Otherwise, his physical examination was unremarkable. [See TK022].

15. Despite his complaints of shortness of breath on September 25, 2016, his oxygen saturation level was normal (98%). [See TK022].

16. The nurse assessing Mr. Foutch on September 25, 2016, administered Chlor-Trimeton (an antihistamine) and Tylenol (for pain) to Mr. Foutch in response to his complaints, which was consistent with Turn Key protocol. [See TK022].

17. Additionally, the same day the Turn Key nurse notified the Nurse Practitioner by phone of Mr. Foutch's medical complaints, and the Nurse Practitioner entered telephone orders to start Mr. Foutch on Albuterol Nebulizer treatments twice a day ("bid") *as needed* ("prn"). [See TK023].

18. When a medication is prescribed "twice a day as needed" ("bid prn"), this does not mean that such medication is required to be administered twice a day; to the contrary, this means that medication is administered when the patient requests such medication and/or when the medical provider assesses the medication as being needed based on clinical observations.

19. Mr. Foutch was administered Albuterol Nebulizer treatments at the following times:

    a. The morning of September 25, 2016 [see TK036];

    b. The morning of September 27, 2016 [see TK036];

    c. The evening of September 27, 2016 [see TK036];

    d. The morning of September 28, 2016 [see TK036];

    e. The evening of September 28, 2016 [see TK036]; and

    f. The evening of September 29, 2016 [see TK036].

20. Mr. Foutch was also administered Chlor-Trimeton at the following times:

    a. The evening of September 27, 2016 [see TK038];

    b. The morning of September 28, 2016 [see TK038];

    c. The evening of September 28, 2016 [see TK038];

    d. The morning of September 29, 2016 [see TK038]; and

    e. The evening of September 29, 2016 [see TK038].

21. Each time Mr. Foutch was administered medication, including his Albuterol Nebulizer breathing treatments, he was physically observed and treated by a Turn Key medical provider.

22. Mr. Foutch did not submit any medical complaints or requests between September 25, 2016 and September 28, 2016. [See TK001-TK041].

23. On Wednesday, September 28, 2016, Mr. Foutch was assessed seen by a Turn Key nurse for Shortness of Breath. At that time, Mr. Foutch reported complaints of: "wheezing with deep breaths and coughing trying to breath deeply." He further reported "[d]ifficulty breathing, episodes of fainting, [and no] appetite" and that he had "chest pain with deep breathing". [See TK017].

24. Upon assessment, the nurse noted that Mr. Foutch's oxygen saturation was within the lower range of normal limits (Oxygen Saturation 92%). She further noted his respirations were even, labored, and shallow; his skin was cool and pale; he appeared to be in mild distress; and she heard wheezes and diminished lung sounds on Mr. Foutch's right side. [See TK017].

25. However, the nurse noted Mr. Foutch was alert and oriented times three (which is reassuring), and he had no fever (Temperature: 97.8). [See TK017].

26. In response to his complaints, the Turn Key nurse administered an Albuterol Nebulizer breathing treatment, upon which she noted that his oxygen saturations improved by

increasing to 95%, which is within normal limits. [See TK017].

27. That nurse left a note for me to contact the Nurse Pracititoner regarding Mr. Foutch when my shift began the next day on September 29, 2016. [See TK018].

28. Accordingly, when I arrived for my shift the next morning on Thursday, September 29, 2016, I personally assessed Mr. Foutch. At the time of my assessment of Mr. Foutch on September 29, 2016, his vital signs were within normal limits aside from a slightly elevated blood pressure (Blood Pressure: 136/92; Heart Rate: 94; Oxygen Saturation: 94%; Temperature: 98°; and Respiratory Rate: 22). [See TK018].

29. On the morning of Thursday, September 29, 2016, I personally administered Chlor-Trimeton to Mr. Foutch. [see TK038].

30. Although I do not have a personal recollection of my specific conversation with Mr. Foutch on the morning of September 29, 2016, in my usual custom, practice, habit and routine, I would have offered Mr. Foutch all of his PRN medications, including the Albuterol Nebulizer treatment.

31. Based upon the Medication Administration Record reflecting that Mr. Foutch did not receive a breathing treatment but *did* receive his allergy medication, more probably than not Mr. Foutch declined his breathing treatment on the morning of September 29, 2016. [see TK036, TK038].

32. On September 29, 2016, I also notified the Nurse Practitioner by phone of Mr. Foutch's medical complaints and condition, and the Nurse Practitioner entered telephone orders to continue Mr. Foutch on his current treatment and to make Mr. Foutch an appointment to see her at the next scheduled clinic on Monday, October 3, 2016, unless Mr. Foutch's symptoms worsened. [See TK017-TK018].

5

33. I continued to monitor Mr. Foutch after my September 29, 2016 morning encounter with him. [See TK018].

34. During the times relevant to Mr. Foutch's care, the Nurse Practitioner held weekly clinics on Mondays at the Creek County Detention.

35. I scheduled Mr. Foutch to see the Nurse Practitioner for October 3, 2016. [See TK018].

36. Based on my experience as a Licensed Practical Nurse, Mr. Foutch's medical condition on September 28 and 29, 2016 was not critical, nor did he present with an emergent medical condition which necessitated additional treatment.

37. I did not believe Mr. Foutch was experiencing an emergent medical condition that necessitated additional treatment or a transfer to the hospital on September 29, 2016.

38. I did not believe, nor did I have any reason to believe, that Mr. Foutch was suffering from a pulmonary embolism (a/k/a blood clot) on September 29, 2016.

39. At approximately 9:00 a.m. on the morning of Friday, September 30, 2016, I notified Mr. Foutch that I had spoken with the Nurse Practitioner, and that she would see him the next Monday if his symptoms did not worsen. At that time, Mr. Foutch told me he agreed with the treatment plan and did not make any complaints. [See TK019].

40. When I spoke with Mr. Foutch at approximately 9:00 a.m. on September 30, 2016, Mr. Foutch appeared to be clinically stable, and I did not believe he was suffering from an emergent medical condition which required additional treatment and/or transfer to a hospital at that time.

41. I did not have an opportunity to chart this interaction prior to Mr. Foutch's medical emergency two hours later. As a result, I made this as a late entry into the chart. [See

TK019].

42. At approximately 11:15 a.m. on September 30, 2016, I was notified by detention staff that inmates had called detention staff to Mr. Foutch's pod to check on Mr. Foutch. I was informed by Detention Officer Conner that Mr. Foutch was cyanotic (blue in color) and not breathing. I was further informed by detention staff that they were able to easily arouse Mr. Foutch, that he was speaking, and that he was coherent. Detention staff brought Mr. Foutch to the Medical Unit to be seen by me, and Mr. Foutch was able to walk at this time. According to detention staff, when Mr. Foutch was outside of the Medical Unit, he became dizzy and collapsed to the floor [See TK018]. At the time I was notified by detention staff I was at a local pharmacy picking up prescription medications for inmates at the Creek County Detention Center.

43. Detention staff called Emergency Medical Service ("EMS") to transport Mr. Foutch to the hospital immediately when he fell in the hallway. [See TK018].

44. I encountered Mr. Foutch while he was lying on the floor with detention staff around him at approximately 11:20 a.m. on September 30, 2016. At that time, although Mr. Foutch did have some lethargy, he was alert, was able to talk, and was answering questions appropriately. However, Mr. Foutch did appear diaphoretic and pale in color. [See TK018].

45. At the time I assessed him at approximately 11:20 a.m. on September 30, 2016, Mr. Foutch's vital signs were mildly elevated (Blood Pressure: 132/92, Heart Rate: 119, Respiratory Rate: 24). However, his oxygen level was within the lower-normal range; therefore, no oxygen treatment was necessary at that time. [See TK018].

46. I did not believe there were any additional medical interventions warranted, as I was advised at the time I took Mr. Foutch's vital signs that EMSA had already arrived at the facility.

47. EMSA arrived at the Creek County Detention Center at approximately 11:25 a.m. on September 30, 2016, at which time Mr. Foutch was lying on the ground and was still able to answer questions and to move onto the gurney with assistance. [See TK018-TK019].

48. Once EMSA arrived on the scene, Mr. Foutch was transferred into their care, although I remained present in the event they required assistance.

49. As Mr. Foutch was being loaded into the ambulance, Mr. Foutch suddenly coded. [See TK019].

50. Prior to approximately 11:20 a.m. on September 30, 2016, I never believed Mr. Foutch was suffering from an emergent condition which required additional treatment and/or transfer to a hospital.

51. The moment I believed Mr. Foutch was suffering from an emergent condition, he was transported to the hospital.

52. I never believed Mr. Foutch was suffering from a pulmonary embolism.

53. I never believed Mr. Foutch was at risk of death.

54. I never denied Mr. Foutch medical care or the opportunity to see a higher level of care provider.

55. I did not observe any other Turn Key healthcare provider deny Mr. Foutch medical care or the opportunity to see a higher level of care provider.

56. I was not indifferent to any of Mr. Foutch's medical complaints or needs.

57. I did not observe any other Turn Key healthcare provider being indifferent to any of Mr. Foutch's medical complaints or needs

58. Turn Key's policy was to provide medical care to inmates.

59. Turn Key policy did not direct its staff to deny care to inmates or to prevent

inmates from seeing a higher level of care provider.

60. Nurses working for Turn Key, including myself, do not treat inmates differently based on whether they are in Department of Corrections custody.

AFFIANT FURTHER SAITH NOT.

*/s/ Nicholas Groom, LPN*
Nicholas Groom, LPN

STATE OF OKLAHOMA     )
                      ) ss.
COUNTY OF OKLAHOMA    )

SUBSCRIBED and sworn before me this 8th day of January, 2019.

DONNA L. SIDMORE
Notary Public
State of Oklahoma
Commission # 00006563 Expires 05/13/20

*/s/ Donna L. Sidmore*
Notary Public

My commission expires:

5/13/20

9